# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| INDUSTRIAL OPPORTUNITY PARTNERS, L.P., | ) ) ) | Case No. 13-cv-6622 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| KENDRION FAS CONTROLS HOLDING GmbH, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Kendrion FAS Controls Holding GmbH's ("Kendrion") motion to stay proceedings in federal court pending the disposition by an independent accounting firm chosen by Kendrion and Plaintiff Industrial Opportunity Partners, L.P. ("IOP") to resolve certain disputed matters involving a term of art in the accounting industry known as "EBITDA," which stands for "earnings before interest, taxes, depreciation, and amortization." [2]. The Court allowed the parties to file oversized briefs to present the issues relating to the stay motion. See [5]. IOP additionally has moved for leave to file a surreply [22], which Kendrion opposes [24]. The Court concludes that a stay during the relatively short anticipated length of the proceedings on the accounting issue is warranted. Accordingly, the motion for stay [2] is granted.[1]

## I. Background

The parties generally are in agreement as to the facts underlying this suit, at least for purposes of the instant motion. IOP entered into a stock purchase agreement with Kendrion

---

[1] The Court has considered both IOP's surreply and Kendrion's response; accordingly, IOP's motion for leave to file a surreply [22] is granted.

pursuant to which IOP sold a company, FAS Controls, to Kendrion. The purchase price was set at $39 million, plus or minus certain adjustments to be made after the deal's closing. One of the adjustments, called an "earnout payment," required Kendrion to pay IOP three dollars for each dollar that FAS Controls's pro forma EBITDA exceeded $6 million in fiscal year 2012. Kendrion was responsible for calculating the pro forma EBITDA in the first instance and came up with a figure of $5.466 million – less than the $6 million threshold that would obligate it pay more money to IOP. IOP disagreed with Kendrion's calculations and engaged its own accountant to calculate the pro forma EBITDA. IOP's accountant calculated a pro forma EBITDA of $6.747 million, which would entitle IOP to a substantial upward adjustment in purchase price under the stock purchase agreement. The lion's share of the difference – some $879,000 – was attributed to "potential price increases," which appear to be the difference between FAS Controls's projected price increases and those actually implemented by Kendrion in fiscal year 2012. IOP's accountant noted that it lacked "adequate basis to determine" whether Kendrion "used all 'commercially reasonable efforts' to implement price increases," [11] Ex. C at 29, but nonetheless proposed the $879,000 upward adjustment after "inquir[ing] of management regarding efforts to pursue specific price increases in FY12" and "compar[ing] average actual unit prices to the planned AOP FY12 unit price." *Id.* at 45.

IOP provided Kendrion written notice of its objections and revised calculation, which incorporated its accountant's report. [11] Ex. D. at 1; [9] at 7; [20] at 16 n.9. IOP objected "to the computation of Pro Forma EBITDA as calculated by Kendrion (the 'Buyer') and its auditors Grant Thornton as set forth in the Earnout Statement." [11] Ex. D at 1. Kendrion rejected IOP's calculations "in full" via an informal e-mail. *Id.* Ex. E.

IOP subsequently filed the instant lawsuit against Kendrion. In its two-count complaint,

2

IOP alleges that Kendrion should indemnify it for breaching two covenants of the parties' stock purchase agreement (Count I) and seeks a declaratory judgment that its indemnification claims are properly resolved by the Court (Count II). The two covenants that Kendrion allegedly breached are in section 1.7(e) of the stock purchase agreement: "Buyer shall act in good faith and the spirit of fair dealing such that the intent of this Section 1.7 [the section providing for the adjustment based on EBITDA] is carried out to the fullest extent practicable," and "Buyer Parent and Buyer shall use commercially reasonable efforts to implement price increases during the Company's fiscal year 2012 in the aggregate that are not less than those contemplated by the Company's 2012 business plan." [11] Ex. A § 1.7(e). Essentially, IOP alleges that Kendrion did not use its best efforts to implement price increases and consequently deprived IOP of an earnout payment that it otherwise would have been due.

Kendrion filed a motion to stay the litigation, pointing to provisions of the stock purchase agreement in which the parties carved out a specific portion of any potential dispute for resolution by accounting professionals. In particular, Kendrion argues that sections 1.4(b) & (c) of the stock purchase agreement require certain disputes, including this one, to be submitted to an "arbitrator," independent accounting firm Deloitte. Sections 1.4(b) & (c) set forth a dispute resolution procedure for matters of post-closing price adjustments; section 1.7(d) provides that "the determination of the amount of the EBITDA for the period in question shall be resolved following procedures set forth in Section 1.4(b) and 1.4(c), as applicable." [11] Ex. A § 1.7(d). Pursuant to the dispute resolution process enumerated in section 1.4, the parties first are obligated to "endeavor in good faith to resolve by mutual agreement all matters in the Dispute Notice," a written notice that the aggrieved party furnishes to the other. *Id.* § 1.4 (b). "In the event that the Parties are unable to resolve by mutual agreement any matter in the Dispute Notice

within [a] 14-day period, the Buyer and the Sellers hereby agree that they shall engage Deloitte * * * * The Sellers and the Buyer shall submit the disputed matters, as described in the Dispute Notice, together with such arguments and supporting material as either of them choose to submit in connection therewith, in writing" to Deloitte. *Id.* Deloitte then "shall determine, based solely on presentations by the Sellers' Representative and the Buyer, and not by independent review, only those issues in dispute specifically set forth in the Dispute Notice and shall render a written report to the Sellers' Representative and the Buyer * * * in which [Deloitte] shall, after considering all matters set forth in the Dispute Notice, determine what adjustments, if any, should be made * * * *" *Id.* § 1.4(c). Deloitte in its review "(i) shall be bound to the principles of this Section 1.4, (ii) shall limit its review to matters specifically set forth in the Dispute Notice, and (iii) shall not assign a value to any item higher than the highest value for such item claimed by either Party or less than the lowest value for such item claimed by either Party." *Id.* Deloitte's report "shall be final and binding upon the Buyer and the Sellers, *shall be deemed a final arbitration award* that is binding on each of the Buyer and the Sellers, and no Party shall seek further recourse to courts, other tribunals or otherwise, other than to enforce" the report." *Id.* (emphasis added).

IOP contends that the procedures in section 1.4 should have no effect on the litigation of its claims because it is seeking indemnification and not merely disputing the calculation of the pro forma EBITDA. Specifically, IOP points to section 7.2 of the stock purchase agreement, pursuant to which Kendrion (the Buyer) agreed to indemnify and hold harmless IOP (the Seller) for any damages resulting from "(a) Breach of any representation or warranty of the Buyer contained in this Agreement or (b) Breach of any covenant or agreement of the Buyer contained in this Agreement." IOP claims that Kendrion should indemnify IOP for breaching its

agreements to "act in good faith and the spirit of fair dealing" and to exercise "commercially reasonable efforts to implement price increases during the Company's fiscal year 2012." Because these allegations do not fall within the narrow scope of a dispute over the mechanical calculation of the pro forma EBITDA – which IOP concedes that Deloitte is authorized to resolve, see [9] at 3 – IOP contends that section 11.16 of the stock purchase agreement should govern. In that provision, the parties agreed that "any action or proceeding arising out of or in connection with this Agreement shall be brought only in a federal court sitting in the city of Chicago, Illinois (the 'Chicago Courts')" and consented "to submit to the exclusive jurisdiction of the Chicago Courts for purposes of any action or proceeding arising out of or in connection with this Agreement." [11] Ex. A § 11.16(a). Nothing in section 11.16 or any other section of the stock purchase agreement requires or authorizes the parties to submit their disputes to Deloitte or any other arbitrator; IOP's representation that the word "arbitration" appears only once in the stock purchase agreement – in the emphasized language excerpted above – appears to be accurate.

## II. Discussion

"The division of labor between courts and arbitrators is a perennial question in cases involving arbitration clauses." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010). It is the sole question properly presented to the Court at this juncture of the case, even though the document at issue does not contain a typical arbitration clause. IOP wants the Court to resolve its indemnification claims[2] either simultaneously with or prior to Deloitte's resolution of the parties' disputes over the calculation of the pro forma EBITDA. See [9] at 3, 19.

---

[2] IOP also mentions in its briefing that it would like the Court to issue a dispositive ruling as to Count II of its complaint, namely that its indemnification claims must be resolved by the Court. See [9] at 3, 19. IOP has not sought this relief in a motion or any other appropriate vehicle. The Court accordingly declines to issue a dispositive ruling at this time.

5

Kendrion takes the position that Deloitte "should decide whether to resolve the price increase question as part of the earnout arbitration." [2] ¶ 3. Kendrion wants the Court to, "[a]t a minimum * * * stay this matter pending the outcome of the arbitration" because "Deloitte may reach conclusions about issues in the Dispute Notice that IOP prepared * * *, including price increases." *Id.* ¶ 4.

Title 9, section 2 of the United States Code (section 2 of the Federal Arbitration Act) provides, in pertinent part, that:

> A written provision in any * * * contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. This provision embodies both a "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, --- U.S. ----, 131 S.Ct. 1740, 1745 (2011) (citations and internal quotation marks omitted). But because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); see also *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 970 (7th Cir. 2007) ("'[A]rbitration under the Act is a matter of consent, not coercion and the parties are generally free to structure their arbitration agreements as they see fit' and 'may limit by contract the issues which they will arbitrate.'" (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989))). "[T]he federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volkswagen*, 474 F.3d at 970 (quoting *Volt*, 489 U.S. at 476).

To advance this policy, the Federal Arbitration Act provides for stays of litigation in federal district courts when an issue in the case is referable to arbitration, 9 U.S.C. § 3, and for

6

orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, 9 U.S.C. § 4. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). Courts also may stay litigation of non-referable issues if allowing them to proceed "risks 'inconsistent rulings' because the pending arbitration is 'likely to resolve issues material to [the] lawsuit.'" *Volkswagen*, 474 F.3d at 972 (quoting *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 242 F.3d 777, 783 (8th Cir. 2001)). "The factors that bear on this inquiry include 'the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays." *Id.* (quoting *AgGrow*, 242 F.3d at 783). "When these factors weigh in favor of staying the entire action pending arbitration, the district court may abuse its discretion in allowing the nonarbitrable issues to proceed absent a stay. In many instances, moreover, district courts actually may prefer to stay the balance of the case in the hope that the arbitration might help resolve, or at least shed some light on, the issues remaining in federal court." *Id.*

Here, there is no motion to compel arbitration, presumably because the parties agree that the calculation of the pro forma EBITDA is a "referable" or "arbitrable" issue. Based on the representations in the parties' briefs, see [9] at 18; [20] at 2 n.3; [22-1] at 9, the Court expects that the parties already have engaged Deloitte or will be doing so in the very near future. The question for the Court is whether the dispute over the reasonableness of Kendrion's efforts to implement price increases should be stayed in the meantime. (IOP suggests that the Deloitte proceeding should be stayed pending the litigation, see [9] at 3, 19, but does not make any argument as to why or on what basis the Court should take that course.) The parties invite the Court to determine whether IOP's claims are "arbitrable," but the Court need not do so at this preliminary juncture. Even if the dispute is not an "arbitrable" one requiring a stay, the Court

7

concludes that a stay is proper because it is highly likely that "the arbitration might help resolve, or at least shed some light on, the issues remaining in federal court." *Volkswagen*, 474 F.3d at 972.

The stock purchase agreement reflects the parties' reasonable conclusion that an accounting firm is better situated than a federal court to expeditiously resolve disputes pertaining solely to accounting computations. The claims in this suit are potentially more robust, but Deloitte's binding and final determination of which items – and what amounts –properly may be considered in the pro forma EBITDA is likely to inform (and perhaps even resolve) issues material to the lawsuit. See [11] Ex. A § 1.4(c). If, for instance, Deloitte concludes that projected price increases are not properly considered in the EBITDA calculation, or that they may be considered but only in an amount significantly below the $879,000 proposed by IOP, the damages available to IOP in this action may be substantially reduced. At a minimum, Deloitte's resolution of the underlying accounting issues will crystallize the remaining dispute for the parties and the Court.

IOP has not indicated, aside from alluding to "inadvertent spoliation of evidence by third parties" in the concluding paragraph of its surreply, [22-1] at 9, how (or even if) it will be prejudiced if the Court stays this action until the conclusion "by year end" of Deloitte's "expedited process regarding disputes over the calculation of the Pro Forma EBITDA Statement," [9] at 18. If the anticipated timeframe for Deloitte's determination holds, any delay in moving this case forward will be relatively minimal in the grand scheme of federal litigation – delaying by perhaps a month or two IOP's expressed goals of proceeding with a Rule 26(f) conference and commencing written discovery by December 1. And waiting for that process to unfold may enable to parties to better focus their discovery efforts once they do get underway.

8

Once Deloitte's work concludes, the parties should be expected – with the assistance and supervision of a Magistrate Judge, if necessary – to make up for any lost time by promptly commencing and moving forward with this litigation once the stay has been lifted. Although the risk of inconsistent rulings if this action moves forward during Deloitte's expedited arithmetical review appears low (and thus militates to some extent against a stay), the binding nature of Deloitte's conclusions and absence of prejudice to either party from the short expected delay convince the Court that the prudent course is to stay the instant proceedings pending Deloitte's determination of the limited and specialized issue that the parties have assigned to it.

## III. Conclusion

For the reasons explained above, the Court grants Kendrion's motion to stay [2] and IOP's motion for leave to file a surreply [22]. The parties are directed to provide the Court with a joint status report within 14 days of the completion of Deloitte's "Adjustment Report" that (1) summarizes (and attaches) the end product of Deloitte's work and (2) addresses how they believe this case should move forward.

Dated: November 1, 2013

_____
Robert M. Dow, Jr.
United States District Judge